IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Action Group International, LLC, | : | Case No. 3:10-cv-2132 |
| | : | |
| Plaintiff, | : | Judge James G. Carr |
| | : | |
| v. | : | Magistrate Judge Armstrong |
| | : | |
| AboutGolf, Limited, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

\* \* \*

**PLAINTIFF ACTION GROUP INTERNATIONAL, LLC'S
MEMORANDUM IN OPPOSITION TO
DEFENDANT ABOUTGOLF, LIMITED'S MOTION TO DISMISS**

Thomas P. Dillon (0059899)
Mark D. Wagoner, Jr. (0068577)
SHUMAKER, LOOP & KENDRICK, LLP
North Courthouse Square
1000 Jackson Street
Toledo, Ohio 43604-1573
Telephone:  (419) 241-9000
Facsimile:  (419) 241-6894
Email:        tdillon@slk-law.com
                 mwagoner@slk-law.com

Attorneys for Plaintiff
Action Group International, LLC

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

SUMMARY OF ARGUMENT ............................................................................................ vi

I.  INTRODUCTION ........................................................................................................ 1

II.  FACTS .......................................................................................................................... 2

    A.  The Parties ........................................................................................................... 2

    B.  The Distributor Agreements ............................................................................... 3

    C.  Action Group's Investment in South Korea ..................................................... 3

    D.  The Vaporware ..................................................................................................... 4

        1. aG Control ........................................................................................................ 5

        2.  PGA Tour Range Surround ........................................................................... 5

        3.  3Trak Mobile/3Trak Cube ............................................................................. 6

        4.  Online Gaming and Connectivity ................................................................. 6

        5.  Club Head Speed Cameras ............................................................................ 6

        6.  Real Time 3D Graphics .................................................................................. 7

    E.  The Problems with AboutGolf's Products ........................................................ 7

    F.  AboutGolf's Infringement on Action Group's Exclusive Rights in South Korea ...................... 8

    G.  The Wrongful Termination of Distributor Agreement ................................... 9

III. LAW AND ARGUMENT ........................................................................................... 9

    A.  A Motion to Dismiss Should Be Denied When the Complaint States a Plausible Claim for Relief ......................... 9

    B.  The Limitation of Liability Clause Does Not Bar Action Group's Claims. ..................... 10

    C.  Limitation of Liability Clause Does Not Bar Claims Arising Out of Prior Agreements. ................... 14

D.  The Termination Provisions Do Not Bar Counts One, Two, Seven, and Eight.................................................................................................................15

E.  Action Group Has Pled a Plausible Claim for a Declaratory Judgment for Breach of Contract. ...................................................................................17

F.  Action Group has Pled a Plausible Claim for Breach of Contract for Infringing on Action Group's Exclusive Territory. ........................................17

G.  Action Group Has Pled a Plausible Claim for Breach of Contract for Failure to Indemnify for Product Defects. ..........................................19

H.  Action Group Has Pled Plausible Claims For Violations Of The Ohio Deceptive Trade Practices Act..........................................................19

I.  Action Group Has Pled Plausible Claims For Fraud. ........................................23

J.  Action Group Has Pled Plausible Claims for Promissory Estoppel .................25

K.  Action Group Has Pled Plausible Claims for Unjust Enrichment ....................27

L.  Action Group Has Pled Plausible Claims for Tortious Interference with Business Relationship. ......................................................................28

IV.  CONCLUSION....................................................................................... 29

CERTIFICATE OF SERVICE ....................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14 (1995)......................................................................................................................28

*Anderson's Inc., v. Factory Mut. Inc. Co.*, No. 3:01cv-7620, 2005 WL 6379480 (N.D. Ohio Jan. 31, 2005)....................................................................................................14

*Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 502 (6th Cir. 2003) ...............................................27

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ............................................................................10

*Auto Chem Laboratories v. Turtle Wax, Inc.,* 2008 WL 4372697 at *14 (S.D Ohio Sept. 23, 2008) ...........................................................................................................................................24

*Berjan v. Ohio Bell Tel. Co.*, 54 Ohio St. 2d 147, 158 (1978)......................................................10

*Carey v. Fed Ex. Ground Package Systems, Inc.*, 321 F. Supp. 2d 902 (S.D. Ohio 2004) ..........24

*Carr v. Apple, Inc., et al.*, C.A. No. 1:09-1996 (N.D. Ohio) .........................................................21

*Casillas v. Stinchcomb*, 2005 WL 1845318 (6th Dist. 2005) ...................................................... 11\

*Collins*, 86 Ohio App. 3d at 834 ....................................................................................................13

*Daup v. Tower Cellular, Inc.*, 136 Ohio App. 3d 555 (2000)........................................................26

*Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F. Supp. 2d 899, 915 (S.D. Ohio 2009) .25, 26

*Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 1028................................................28

*Farmers Nat'l Bank v. Delaware Ins. Co.*, 83 Ohio St. 309 (1911) .......................................12, 16

*Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority*, 78 Ohio St. 3d 353 (1997)...................................................................................................................12, 16

*Gouge v. Backs Global, Inc.*, 252 F. Supp. 2d 509 (N.D. Ohio 2003) ........................................24

*Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311 (1996) ...........................................................11

*Gray-Jones v. Jones*, 137 Ohio App. 3d 93, 100-01 (2000))........................................................28

*Hambleton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 183 (1984) ................................................27

iii

*HER, Inc. v. RE-Max First Choice, LLC*, 468 F. Supp. 2d 964, 979 ............................................22

*Homecomings Fin., LLC v. Negrea*, No. 1:09-cv-2032, 2010 WL 85640
    (N.D. Ohio, Jan. 6, 2010) ...................................................................................................27

*Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002) ....................................................10

*Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008) ...............................................10

*Local 4501, Commc'ns Workers of America v. Ohio State Univ.*,
    24 Ohio St. 3d 191, 195 (1986) .........................................................................................14

*Lucky Discount Lumber Co., Inc. v. Machine Tools of America, Inc.*,
    181 Ohio App. 3d 64 (2009) ..............................................................................................22

*McNamara v. Ohio Building Authority*, 697 F.Supp.2d 820 (March 29, 2010) (Carr, J.)..............9

*Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866 (6th Cir. 2007) ....................................................24

*Miller v. Lindsay Green, Inc.*, 2005-Ohio-6366 (Ohio App.)) ...............................................26

*MMK Group, LLC v. SheSells Co., Inc.*, 591 F. Supp. 944 (N.D. Ohio 2008) .............................27

*Nahra v. Honeywell, Inc.*, 892 F. Supp. 962, 969 (N.D. Ohio 1995) ................................10, 13, 16

*Orlett v. Suburban Propane*, 54 Ohio App. 3d 127 (1989) .....................................................13

*Pietrangelo v. Apple, Inc., et al.,* C.A. No. 1:09-1992 (N.D. Ohio) .............................................21

*Preston v. Ferguson*, 170 Ohio St. 450 (1960) ...................................................................14

*Sanfillipo v. Rarden*, 24 Ohio App. 3d 164 (1985)...............................................................24

*Solid Gold Jewelers v. ADT Sec. Sys., Inc.*, 600 F. Supp. 2d 956 (N.D. Ohio 2007) ...................10

*State ex rel. Preston v. Ferguson*, 170 Ohio St. 450 (1960) .........................................................14

*Sullivan v. Apple, Inc., et al.*, C.A. No. 1:09-1993 (N.D. Ohio).....................................................21

*Superior Integrated Solutions v. Reynolds and Reynolds Co.*, 2009 WL 4135711
    (S.D. Ohio 2009).................................................................................................................10

*United States v. Microsoft*, 159 F.R.D. 318 (D.D.C. 1995),
    rev'd. per curium 56 F.3d 1448 (D.C. Cir. 1995) .............................................................20

*Wolfer Enters. v. Overbrook Dev. Corp.*, 132 Ohio App. 3d 353 (1999).......................................27

**Statutes**

O.R.C. §1302.91 ...................................................................................................17

O.R.C. §4165.02(A)(1), (2), (3), and (10). .................................................22, 23

O.R.C. §4165.02(A)(11) ......................................................................................22

O.R.C. §4165.02(A)(7),(8), and (11) ..............................................................22, 23

O.R.C. §4165.02(A)(9) ........................................................................................22

O.R.C. §4165.03 ...................................................................................................22

**Treatises**

Robert Prentice, *Vaporware:  Imaginary High-Tech Products and Real Anti-*
   *TrustLiability in a Post-Chicago World*, 57 Ohio St. Law Journal 1163, 1164
   (1996).................................................................................................................20

## SUMMARY OF ARGUMENT

First, Plaintiff Action Group International, LLC ("Action Group") has pled facts in the Complaint sufficient to state plausible claims against Defendant AboutGolf, Limited ("AboutGolf"). The facts contained in the 17-page Complaint, and the reasonable inferences drawn from them, are more than sufficient to withstand a motion to dismiss.

Second, a limitation of liability clause cannot be enforced when the party invoking the provision has committed a willful breach of the contract. Here, the Complaint pleads plausible claims that AboutGolf willfully breached the contract in several respects. AboutGolf cannot have willfully breached the contract (including its wrongful termination), and then invoke a provision that essentially precludes Action Group - the non-breaching party - from recovery. In addition, the limitation of liability clause is unconscionable given the widespread deceit and fraud pled in the Complaint. Finally, the limitation of liability clause is vague and ambiguous as to its terms and meaning, thus making it unenforceable.

Third, the Complaint states a plausible claim for fraud. AboutGolf simply ignores the well known exception that promises about future actions can constitute fraud when the person making the statement has no present intent to perform. AboutGolf's deceitful practice of vaporware and other promises of future actions were made with the present intent not to perform. That states a claim for fraud.

## I.  __INTRODUCTION__

Anyone planning to engage in fraudulent and deceitful activities would hope to be allowed to act with impunity from the outset.  If that were the case, then every bad actor would ask the unsuspecting party – well before the unsuspecting party learned of the fraudulent scheme – to sign away their rights to later recover.  Then, with the trap set, the bad actor could perpetrate their fraudulent scheme thinking they could act without consequence.  But the law does not allow a bad actor to spring such a trap.  Neither should this Court.

Action Group invested millions of dollars and thousands of work hours to open the door for AboutGolf and its products in South Korea.  Before Action Group's efforts, AboutGolf had little – if any – visibility in South Korea.  Action Group toiled in the fields, planted the seeds, and watered the crops, only to have AboutGolf elbow its way to wrongfully reap the benefits of what Action Group sowed.

If that were not bad enough, AboutGolf set Action Group up to fail.  AboutGolf engaged in a deceitful practice known as "*vaporware*" – the high technology industries' practice of engaging in pre-announcing products that do not exist at the time of their announcement and may never exist in anything like their described form.  AboutGolf urged Action Group to sell products to customers in South Korea with representations about what the products would do or could do.  AboutGolf knew that those representations were false at the time they made them.  Action Group then relied on AboutGolf's representations and passed them along to its customers, many of whom purchased the products based on those representations.  When those representations never came true, Action Group's business began to crumble on the faulty foundation of AboutGolf's vaporware.

To make matters even worse, AboutGolf provided to Action Group products that were riddled with problems. Action Group was forced to provide repair work on the products at a cost of more than $700,000, an amount for which AboutGolf was contractually obligated to indemnify Action Group.   With unhappy customers (many of whom were withholding payments), unfulfilled promises, and failing products,  Action Group then received a letter from AboutGolf claiming it was owed $166,452 and, if not paid in ten days, that AboutGolf would terminate Action Group as a distributor.  Action Group did not owe AboutGolf the $166,452. Quite the opposite, in fact:  AboutGolf owed many more times that amount to Action Group. Shortly after the letter, AboutGolf then wrongfully terminated Action Group as a distributor – leaving it exposed to unknown liabilities and broken promises.  This litigation soon followed.

Now, AboutGolf says Action Group's claims should be dismissed due in large part to a vague and ambiguous clauses buried in one of the three distributor agreements.  Yet, the law is clear that one cannot invoke a limitation of liability clause in a contract if that same party has committed a willful breach of the contract – precisely what has been pled here.  After willfully breaching the contract, AboutGolf cannot now shield itself from liability through the contract.

Action Group has pled sufficient facts to give rise to claims to provide a remedy for AboutGolf's wrongful actions.  For these reasons, as will be discussed in more detail below, this Court should deny Defendant's Motion to Dismiss.

## II.    FACTS

### A.  The Parties

Plaintiff Action Group is a New Jersey limited liability company with its principal place of business in Fort Lee, New Jersey.  Pursuant to several distributor agreements, Action Group is the exclusive distributor of Defendant AboutGolf products throughout South Korea.

(Complaint at ¶1.) AboutGolf is an Ohio limited liability company with its principal place of business in Maumee, Ohio. (Complaint at ¶2.)

### B.  The Distributor Agreements

The parties have been in business with each other since March of 2008 through a series of one-year distributor agreements. In March of 2008, Action Group entered into a written distributor agreement with AboutGolf (the "2008 Agreement") for the exclusive right to market, sell, install, and service AboutGolf's 3Trak Products in South Korea for one year.  (Complaint at ¶5.)  In March of the next year, Action Group signed a second written distributor agreement with AboutGolf (the "2009 Agreement") for the exclusive right to market, sell, install, and service AboutGolf's 3Trak PGA Tour Simulators and related peripheral products in South Korea, again for one year.  (Complaint at ¶6.)  Then, in April of 2010, Action Group entered into a third written distributor agreement with AboutGolf (the "2010 Agreement") for the exclusive right to market, sell, install, and service AboutGolf's products in South Korea.  This agreement was also for one year. (Complaint at ¶8) AboutGolf, through meetings with Bill Bales, Ray Gaynor, Barry Johnston and Rob Johnston, made representations that it intended a long standing business relationship with Action Group, and that the expectation of the parties was that the distributor agreement would be renewed. (Id.)

### C.  Action Group's Investment in South Korea

Action Group spent millions of dollars and thousands of work hours selling, servicing, and marketing AboutGolf products in South Korea.  Further, Action Group developed and utilized its own good will to advance the sales of AboutGolf products throughout South Korea. (Complaint at ¶9)  Action Group invested in excess of $5 million dollars to develop the market in South Korea for AboutGolf's products. (Complaint at ¶10)

As a result of Action Group's efforts, the South Korea market increased to at least 32% of AboutGolf's international sales.  As a direct result of Action Group's efforts, South Korea became the most lucrative international territory for AboutGolf's sales in 2009. (Complaint at ¶11)  Action Group opened offices in South Korea to handle the marketing, selling, installation, and servicing of AboutGolf's products.  Action Group's employees devoted substantial time and attention to developing and servicing the market in South Korea.  These efforts required over 60 trips to South Korea, and local trips throughout, with travel costs of more than $500,000. (Complaint at ¶12)

Action Group comprehensively and exhaustively advertised AboutGolf's products throughout South Korea.  These efforts included television commercials on South Korean television, widespread print media, celebrity endorsements, and booths at some of South Korea's largest tradeshows, often at a cost of hundreds of thousands of dollars.  (Complaint at ¶13)  Through these efforts, Action Group significantly increased the awareness and sales of AboutGolf's products to customers throughout South Korea. (Complaint at ¶14)

### D.  <u>The Vaporware</u>

During the term of the relationship, AboutGolf repeatedly made fraudulent and deceptive statements about the capabilities and characteristics of its products.  In addition, AboutGolf engaged in the practice of selling *"vaporware"* – the high technology industries' marketing ploy of pre-announcing products that do not exist at the time of the announcement and may never come into existence in anything like their described form.  AboutGolf would then encourage Action Group to market and sell the vaporware that was either non-existent or not ready for the market.  AboutGolf knew, or should have known, that it would not be able to release its products by the dates specified.  Nevertheless, AboutGolf repeatedly encouraged Action Group to sell the vaporware described below. (Complaint at ¶26)

### 1. <u>aG Control</u>

AboutGolf made fraudulent and deceptive statements about the status of the product "aG Control" (a/k/a "aG Center"). Bill Bales, the former CEO of AboutGolf, represented to Chris Chung and Bill Savino in the winter of 2008 that aG Control was being developed and would be ready for sale soon. AboutGolf went so far as to develop a mock-up of the aG Control screen that represented what the product supposedly would do. (Complaint at ¶27) Relying on these representations about the status of aG Control, Action Group marketed and sold many AboutGolf products with the representation that aG Control would be available and included in the sold products. (Complaint at ¶28) AboutGolf never delivered the aG Control product as it represented to Action Group. (Complaint at ¶29)

### 2. <u>PGA Tour Range Surround</u>

AboutGolf made fraudulent and deceptive statements about the status of the product "PGA Tour Range Surround." In June 15, 2008 sales material, AboutGolf represented that PGA Tour Range Surround would be available in 2009. That information was separately reiterated by Ray Gaynor, Vice President of International Sales, to Chris Chung and Bill Savino, and included in materials provided on January 27, 2009 during a distributor sales meeting. (Complaint at ¶30) Relying on these representations about the status of PGA Tour Range Surround, Action Group marketed and sold several PGA Tour Range Surround systems. In addition, several Action Group customers had reserved space for the Range Surround. Given the extraordinary cost of real estate in South Korea, Action Group's customers lodged a listing of complaints that resulted in severe loss of goodwill and money damages. (Complaint at ¶31) AboutGolf never delivered the PGA Tour Range Surround product as it represented to Action Group. (Complaint at ¶32)

### 3.  3Trak Mobile/3Trak Cube

AboutGolf made fraudulent and deceptive statements about the status of the products "3Trak Mobile" and "3Trak Cube."  Ray Gaynor represented to Chris Chung and Bill Bales in January of 2009 that "3Trak Mobile" and "3Trak Cube" were being developed and would be available soon.  Ray Gaynor went so far as to show Action Group a prototype of the "3Trak Mobile" and "3Trak Cube" in South Korea, and made representations that the products were available. (Complaint at ¶33)  Relying on these representations about the status of "3Trak Mobile" and "3Trak Cube," Action Group marketed and sold these products. (Complaint at ¶34)  AboutGolf never delivered "3Trak Mobile" and "3Trak Cube" as it represented to Action Group.  (Complaint at ¶35)

### 4.  Online Gaming and Connectivity

AboutGolf made fraudulent and deceptive statements about the status of its products' capabilities for online gaming and connectivity.  AboutGolf informed Action Group that it was developing an online gaming and connectivity solution so that Action Group could compete against competitors' products that offer similar capabilities.  These representations were made by Ray Gaynor and Bill Bales in 2008, and reiterated throughout the parties' relationship. (Complaint at ¶36)  Relying on these representations about the status of its online gaming and connectivity, Action Group marketed and sold several AboutGolf products promising they would have this capability. (Complaint at ¶37) AboutGolf never provided for online gaming and connectivity for its products. (Complaint at ¶38)

### 5.  Club Head Speed Cameras

AboutGolf made fraudulent and deceptive statements about the development of additional sensors and cameras to gauge and record individual ball speed and flight trajectory, as well as club speed and path.  AboutGolf informed Action Group of these innovations in sales materials dated June 15, 2008.  In those materials, AboutGolf represented that these sensors, which included an additional

camera, would be available by early 2009. (Complaint at ¶39)  Relying on these representations about the status of the sensors and camera, Action Group marketed and sold several products promising that they would have this capability. (Complaint at ¶40)  AboutGolf failed to supply these products until May 2010, well after Action Group had expended a considerable amount of good will and work hours attempting to satisfy customer dissatisfaction with AboutGolf's merchandise.  Even then, AboutGolf failed to supply these products with the promised quality and capabilities of an additional camera. (Complaint at ¶41)

### 6.  Real Time 3D Graphics

AboutGolf made fraudulent and deceptive statements about the development of Real Time 3D Graphics.  AboutGolf informed Action Group of these innovations in sales materials dated June 15, 2008.  In those materials, AboutGolf represented that these graphics would be available by early 2009. (Complaint at ¶42)  Relying on these representations about the status of the high-end graphics, Action Group marketed and sold many products promising that they would have this capability. (Complaint at ¶43) Action Group spent a tremendous amount of money marketing and advertising  Real Time 3D Graphics in their brochures, on their website, at tradeshows, and through all other forms of media. (Complaint at ¶44)  AboutGolf never provided for Real Time 3D Graphics for its products as it represented to Action Group.  (Complaint at ¶45)

### E.  The Problems with AboutGolf's Products

Since it began selling, servicing, and marketing AboutGolf products, Action Group has been inundated with customer complaints regarding faulty and defective products.  In hopes of preserving its business and salvaging its reputation and goodwill, Action Group remedied many of these complaints itself, because AboutGolf was unable or unwilling to fix its defective products.  Action Group elected to later seek recovery from AboutGolf.  (Complaint at ¶15)  Action Group serviced AboutGolf's products

during and after these sales to address the numerous problems that consistently arose with AboutGolf's products.  These service costs totaled in excess of $700,000. (Complaint at ¶16)

Action Group spent a massive amount of time and money servicing and addressing the problems with AboutGolf's products.  These problems significantly detracted from the goodwill associated with AboutGolf's products in South Korea.  But for Action Group's efforts, the ability to sell AboutGolf's products in South Korea was in jeopardy.  As a result of these problems with AboutGolf's products, customers have and continue to delay and withhold payments.  As a result of these problems, Action Group was also required to front several hundred thousand dollars for necessary repairs. (Complaint at ¶17)

In each of the Distributor Agreements, AboutGolf agreed to indemnify Action Group from any loss or claim arising out of warranty-related defects that existed at the time of delivery.  AboutGolf has repeatedly failed to meet its contractual obligations.  (Complaint at ¶18)  AboutGolf's breach of these express contractual obligations to indemnify Action Group for defects in its products has caused Action Group to sustain substantial monetary losses and lost profits.  Furthermore, AboutGolf's conduct has caused irreparable damage to Action Group's reputation and good will in South Korea. (Complaint at ¶19)

**F.    AboutGolf's Infringement on Action Group's Exclusive Rights in South Korea.**

In the Distributor Agreements, AboutGolf granted Action Group the exclusive right to distribute goods throughout South Korea.  (Complaint at ¶20)  In violation of these exclusive rights, AboutGolf contacted and developed relationships with other distributors in South Korea. (Complaint at ¶21)

One example of this improper conduct occurred when AboutGolf contacted UMB Communications, a competitor of Action Group in South Korea.  Upon information and belief, AboutGolf engaged in discussions with UMB to develop and distribute AboutGolf's products in South

8

Korea. (Complaint at ¶22)  Chuck Faust, the COO of AboutGolf and others, with a sense of urgency, insisted on an immediate conference call on August 14, 2010 regarding their communications with "a very large prospect."  That "very large prospect" was later identified as UMB Communications.  UMB Communications had offered to purchase at least 20 AboutGolf's simulator per month from AboutGolf. (Complaint at ¶23) Upon information and belief, AboutGolf has had other improper communications and sales with potential South Korean customers in violation of Action Group's exclusive territory. (Complaint at ¶25)

### G.  The Wrongful Termination of Distributor Agreement

On August 31, 2010, AboutGolf sent a letter to Action Group alleging that Action Group had violated its obligations under the 2010 Agreement for two reasons: (1) failure to pay the approximately $166,452, and (2) failure to submit reports.  (Complaint at ¶46)  AboutGolf wrote that Action Group had 10 days to pay the $166,452, and 30 days to file the proper reports.   The allegations in the letter were false and made for the sole purpose of allowing AboutGolf to evade its obligations to Action Group under the 2010 Agreement.  (Complaint at ¶47)

On September 22, 2010 –  22 days after the first letter was sent and five months after the 2010 Agreement was signed – AboutGolf sent a letter to Action Group purportedly terminating the 2010 Agreement for the sole reason of the nonpayment of the $166,452, an amount that Action Group denied was due and owing. (Complaint at ¶49)

### III.  LAW AND ARGUMENT

### A.  A Motion to Dismiss Should Be Denied When the Complaint States a Plausible Claim for Relief.

A claim survives a motion to dismiss under Fed. R. Civ. P. 12(b)(6) if it "contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *McNamara v. Ohio Bldg. Auth.*, 697 F.Supp.2d 820, 824-25 (N.D. Ohio 2010) (Carr, J.) (citing

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). The complaint should be viewed "in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008) (internal quotation and citation omitted); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).

### B.     The Limitation of Liability Clause Does Not Bar Action Group's Claims.

AboutGolf contends that Action Group's entire complaint should be thrown out because one of the three Distributor Agreements contains a limitation of liability provision. When the argument is reduced to its essence, AboutGolf asserts that it is free to willfully breach the contract, engage in fraudulent activities, and then limit any liability through a vague and ambiguous clause buried in one of the contracts. That is not the law and, certainly, violates all notions of fair play.

Ohio courts view limitation of liability clauses critically. *Nahra v. Honeywell, Inc.*, 892 F. Supp. 962, 969 (N.D. Ohio 1995). A limitation of liability clause should not be enforced if the party "invoking the provision has committed a willful or reckless breach of the contract." *Id.* (citing *Berjan v. Ohio Bell Tel. Co.*, 54 Ohio St. 2d 147, 158 (1978)); *Superior Integrated Solutions v. Reynolds and Reynolds Co.*, No. 3:09-cv-314, 2009 WL 4135711, at *3 (S.D. Ohio Nov. 23, 2009); *Solid Gold Jewelers v. ADT Sec. Sys., Inc.*, 600 F. Supp. 2d 956, 959 n.2 (N.D. Ohio 2007). A limitation clause will also not be enforced if the language is "unconscionable, in violation of public policy considerations, or vague and ambiguous." *See Superior Integrated Solutions*, 2009 WL 4135711, at *3 (citing *Hurst v. Enter. Title Agency*, 157 Ohio App. 3d 133 (2004)).

Here, AboutGolf is unable to avail itself of the limitation of liability clauses because there are sufficient facts pled to show that it willfully breached the contract in three respects.

First, Action Group has pled that the unpaid $166,452—the **sole** reason for the termination by AboutGolf—was not due and owing. (Complaint at ¶15-19, 46-49.)  Since there were insufficient grounds to prematurely terminate the 2010 Agreement, doing so constituted a willful (and wrongful) breach of the contract by AboutGolf.  The second is the pleading that AboutGolf failed to indemnify Action Group for the problems with AboutGolf's products, a cost that exceeded $700,000. (Complaint at ¶¶15-19.)   Again, failing to pay that amount constitutes willful breach of the contract by AboutGolf.  The third is the pleading that AboutGolf infringed on AboutGolf's exclusive rights "to market, sell, install, and service" products through its dealings with UMB Communications – a competitor of Action Group. (Complaint at ¶¶20-25)  Once again, those facts constitute a willful breach of the contract by AboutGolf.

When construed in a light most favorable to Action Group and taking all reasonable inferences in its favor, the pleading of these three willful breaches by AboutGolf make any limitation of liability clause unenforceable.  To be sure, AboutGolf will assumingly challenge whether its actions were willful breaches or not.  But those sorts of fact specific defenses are not properly resolved through a motion to dismiss.

A second reason the limitation of liability clause is unenforceable is that it is vague and ambiguous.   A contract term is vague and ambiguous if it susceptible to more than one interpretation.  *Casillas v. Stinchcomb*, No. E-04-041, 2005 WL 1845318, ¶13 (Ohio Ct. App).  Furthermore, it is a longstanding rule of contract construction that ambiguities are construed against the drafter.  *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 314 (1996).

In its Motion to Dismiss, AboutGolf highlights a solitary contract provision in hopes that the Court will refrain from reading the rest of the 2010 Agreement.  Because a written contract must be read as a whole, however, the intent of each part of the 2010 Agreement—including the

limitation of liability clause—must be considered in light of the entire agreement.  See *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 78 Ohio St. 3d 353, 361-62 (1997).  Immediately preceding the limitation of liability clause, Section 15 of the 2010 Agreement states in plain language that "[AboutGolf] agrees to protect [Action Group] and hold [Action Group] harmless from *any loss or claim* arising out of warranty-related defects…" (emphasis added).[1]  Immediately after this indemnification provision, Section 16(B) states:

> [AboutGolf] shall not be liable for any claim of any kind arising from…(B) *indirect* incidental, consequential, special or punitive damages known or unknown, including, without limitation, lost revenues and profits, loss of production, or injury to persons and/property…

(emphasis added).  When read together with Section 15, it becomes clear that the parties' intention was not to limit Action Group's ability to recover "*direct*" damages—that is, direct incidental, consequential, special or punitive damages arising out of warranty-related defects.  Instead, the express disclaimer of specific types of damages uses the modifier "*indirect*" indicates that the parties' intended Section 16(B) to limit AboutGolf's exposure from specific types of damages arising out of the claims of unknown third-party end-users.

A fundamental goal of contract construction is to give effect to every provision in an agreement.  *Farmers Nat'l Bank v. Delaware Ins. Co.*, 83 Ohio St. 309 (1911), syllabus.  To read Section 16(B) as broadly as AboutGolf contends would effectively render Section 15's indemnification provision meaningless.  Therefore, this limitation of liability is vague and ambiguous and the Court should deny AboutGolf's attempt to extinguish Action Group's legal rights through it.

---

[1]Contrary to AboutGolf's assertions, no provision in the agreement strictly limits AboutGolf's potential liability to Action Group to "actual damages, such as the cost to repair or replace a defective part."  (Brief at p. 10)

A final reason to avoid the application of the limitation of liability clause is that sufficient facts have been pled that its enforcement would be unconscionable.  A liability limitation may be avoided for unconscionability by showing that the clause is commercially unreasonable and that the party against whom enforcement is sought had no meaningful choice but to accept its inclusion in the contract.  *Collins*, 86 Ohio App. 3d at 834; *Nahra*, 892 F. Supp. at 970.

Where a limitation of liability clause is unreasonably favorable to the other party and not a good predictor of future liability, it may be held unconscionable.  See *Collins*, 86 Ohio App. 3d at 834.  That is precisely the issue here.  AboutGolf asks the court to interpret the limitation of liability clause in the broadest sense possible. But, this interpretation would effectively foreclose Action Group from all meaningful methods of recovery.  Such an interpretation would allow AboutGolf to act maliciously and intentionally—as it has done here—but also to act with impunity.  Ultimately, this interpretation is unconscionable as it would allow AboutGolf to reap a windfall while shielding itself from all potential liability.  At the very least, the facts pled in the Complaint give rise that this inference is unconscionable.  Thus, it is inappropriate to address these issues through a motion to dismiss.  Indeed, a more involved factual record will give the Court a better sense of how to determine whether the terms are unconscionable.

Further, "unconscionability" is generally recognized as a situation where "a severe imbalance of bargaining power exists."  *Orlett v. Suburban Propane*, 54 Ohio App. 3d 127, 129 (1989).  The 2010 Agreement is a manifestation of exactly this sort of "severe imbalance."  The limitation of liability clause—which appears only in the 2010 Agreement—represents the culmination of two years of calculated manipulation designed to slowly deprive Action Group of any semblance of contractual protections and bargaining power.  For two years prior, the Complaint alleges that AboutGolf fraudulently engaged in the deceitful practice of vaporware in

13

order to encourage Action Group to leverage itself in a foreign market.  (Complaint at ¶¶27-45)  After Action Group spent two years of time and millions of dollars developing AboutGolf's South Korean distribution network, including specialized employees, local offices, and public marketing, it was promptly rewarded with a one-sided, standardized renewal agreement for 2010.  (Complaint at ¶9-14)  Given the precarious position AboutGolf had placed Action Group, there was a severe imbalance of bargaining power at that point in time.  Thus, the facts pled and the reasonable inferences drawn from them state a plausible claim that the enforcement of the limitation of liability clause would be unconscionable.

**C.      Limitation of Liability Clause Does Not Bar Claims Arising Out of Prior Agreements**

For the reasons discussed above, the limitation of liability clause is not enforceable.  But if it is, and because the limitation clause only appears in the 2010 Agreement, the clause does not limit the types of recoverable damages arising out of the 2008 Agreement or the 2009 Agreement.  Ohio law recognizes a fundamental difference between a "renewal" contract and a mere contract "extension."[2]  See *Local 4501, Commc'ns Workers of America v. Ohio State Univ.*, 24 Ohio St. 3d 191, 195 (1986); *State ex rel. Preston v. Ferguson*, 170 Ohio St. 450, 457-58 (1960); *Anderson's Inc., v. Factory Mut. Inc. Co.*, No. 3:01cv-7620, 2005 WL 6379480, at *3 (N.D. Ohio Jan. 31, 2005).    Because the 2009 and 2010 Agreements are unambiguously

---

[2]The Ohio Supreme Court has stated, "A contract containing an option to renew has the effect of granting a right to execute a *new* contract…and the new contract is operative immediately after the terminal date of the original contract."  *State ex rel. Preston v. Ferguson*, 170 Ohio St. 450, 457-58 (1960).    On the other hand, an "option to extend an agreement…operates to extend the term of the original agreement and the contract then becomes one for both the original and the extended term."  *Id.*  In making a determination on whether a contract is a renewal agreement or an extension, the Ohio Supreme Court has suggested that the presence of a new specified term, new consideration, and the absence of a mandatory extension are characteristics of a "renewal."  *Local 4501*, 24 Ohio St. 3d at 194.  Here, in addition to unambiguous "renewal" language, the renewal agreements satisfy each factor.

characterized as "renewal" contracts, any chose in action—including the types of damages recoverable from them—based on the 2008 and 2009 Agreements remains independent and unaffected by the limitation of liability clause embedded within the 2010 Agreement. Furthermore, because the limitation of liability clause does not operate as a release of prior claims for damages—nor can it be argued that it is an unambiguous representation of such a release—any chose in action stemming from the 2008 and 2009 Agreements remains actionable to its fullest extent without consideration of the limitation clause.

### D.     The Termination Provisions Do Not Bar Counts One, Two, Seven, and Eight.

In its attempt to summarily dismiss four of Action Group's claims,[3] AboutGolf contends that the limitation of liability provision—which has been shown to be unenforceable—and an "effect of termination" clause bars any opportunity for Action Group to seek relief from a wrongful termination. Despite AboutGolf's assertions to the contrary, its interpretation of the termination provisions is overbroad and ignores the contract's express contractual protections regarding early termination.

Each of the distributor agreements provide for just two methods of termination: (1) the natural end of the contract's term or (2) early termination pursuant to specifically delineated conditions and circumstances. (See 2010 Agreement (Sections 18 and 19); 2009 Agreement (Sections 14 and 15); 2008 Agreement (Sections 14 and 15)). Action Group has alleged in the Complaint that AboutGolf did not comply with either method of proper termination and, therefore, wrongfully terminated its distributorship. Despite the express contractual protections regarding termination and the Complaint's allegations of wrongful termination, AboutGolf

---

[3]These claims include count one (declaratory judgment: improper termination), count two (breach of contract: infringement on Action Group's exclusive territory), count six (promissory estoppel), and count seven (unjust enrichment).

15

insists that the agreement bars a court from determining whether it was wrongful to terminate the contract itself.  AboutGolf's interpretation would conveniently allow it to terminate Action Group *at will* and render any provisions regarding the propriety of a termination meaningless.

Contrary to AboutGolf's contentions, any limitation of liability involving the contract's termination must be necessarily premised on a *proper* termination of the contract.  In effect, AboutGolf is attempting to convince the Court to give effect to particular contractual provisions while ignoring others.  A written contract, however, must be read as a whole.  *Foster Wheeler Enviresponse, Inc.*, 78 Ohio St. 3d at 361-62.  A fundamental goal of contract construction is to give effect to every provision in an agreement.  *Farmers Natl Bank v. Delaware Ins. Co.*, 83 Ohio St. 309, syllabus.  Here, Section 19 of the 2010 Agreement delineates specific requirements that would enable AboutGolf to terminate the agreement early.  AboutGolf has failed to meet these requirements, yet asks this to allow it to terminate the distributorship with impunity.

Furthermore, AboutGolf cannot, in good faith, argue that an infringement upon Action Group's exclusive territory is encompassed by the "arising out of termination" language.[4] Action Group has alleged that AboutGolf violated the contract's exclusivity provision during the contract term.  No matter how broadly AboutGolf wishes this court to interpret the limitation clause—which is unenforceable regardless—any such violation does not implicate termination whatsoever.  To the extent that AboutGolf believes that a breach of the exclusivity provision may relate to termination, this assertion would squarely depend on whether or not termination was proper under the contract.

---

[4]In an attempt to bring this and other claims within the scope of the limitation of liability clause—a clause unenforceable for reasons stated *supra*—AboutGolf cites two federal cases for the proposition that the language "arising out of" is extremely broad.  The cases it cites, however, interpret contractual arbitration clauses—clauses that are subject to broad interpretation as a matter of policy.  On the other hand, limitation of liability clauses, like the one at issue here, are to be narrowly construed and viewed critically.  *See Nahra*, 892 F. Supp. at 969.

### E.  Action Group Has Pled a Plausible Claim for Declaratory Judgment for Breach of Contract.

AboutGolf alleges that there are insufficient facts pled regarding the wrongful termination of contract claim.  This contention simply ignores the facts pled in the complaint.

The 17-page complaint makes numerous references to the fact that Action Group was owed well over $700,000 for repairs and damages related to AboutGolf's supply of defective products.   The facts pled and the reasonable inferences drawn from them further show that the amount due and owing to Action Group – over $700,000 –  more than offset any amounts that may have allegedly been owed to AboutGolf – alleged to be $166,452. (Complaint at ¶15-19).  Ohio law is clear that Action Group was entitled to offset the amount in damages it had incurred from any payments that may have been owed to AboutGolf.  *See O.R.C. §1302.91* ("The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.")

From this, Action Group pled that no amounts were due and owing AboutGolf. (Complaint at ¶53)  If anything, the opposite has been pled: That AboutGolf owes money damages to Action Group. Consequently, AboutGolf had insufficient grounds to prematurely terminate the 2010 Distributor Agreement.  AboutGolf's brief makes clear that it disagrees with what amounts were owed and to whom.  But those are factual issues that, at this early stage, are unable to be resolved through a motion to dismiss.

### F.  Action Group has Pled a Plausible Claim for Breach of Contract for Infringing on Action Group's Exclusive Territory.

Through the Distributor Agreements, Action Group had the "right to market, sell, install, and service the Products exclusively" within the exclusive territory of "the Country of South

Korea." (2010 Distributor Agreement, §1 and Exhibit A).  Action Group pleads in ¶¶20-25 of the Complaint that AboutGolf was infringing on its exclusive rights "to market, sell, install, and service" products through its dealings with UMB Communications – a competitor of Action Group.  The complaint details a phone call on August 12, 2010 where Chuck Faust –  COO of AboutGolf – acknowledged that he had been in contact with UMB Communications to sell at least 20 simulators per month in South Korea. (Complaint at ¶20-25).  Those facts give rise to the reasonable inference that, prior to Chuck Faust's call, AboutGolf had been marketing its simulators directly to UMB outside of Action Group.[5]  Only Action Group, however, had the exclusive right to "market" AboutGolf's products in South Korea under §1 of the 2010 Distributor Agreement.

Soon after the call, AboutGolf concocted the false reasons for termination.  These facts pled in the Complaint give rise to the reasonable inference that AboutGolf was working around Action Group and attempting to cut it out of any commissions, both of which would be a violation of Action Group's exclusive rights in South Korea.  Without discovery, however, it is impossible for Action Group to know the extent of any secret communications between AboutGolf and UMB.   But where there's smoke, there's fire.   Construing the reasonable inferences in favor of Action Group show that it has a plausible claim that AboutGolf breached the exclusivity provision of the Distributor Agreement.

---

[5]AboutGolf contends that the exclusivity provisions do not "prohibit AboutGolf from discussing its own products with another distributor."  (Brief at p. 14)  Not so.  Having these sort of conversations with another distributor in South Korea could certainly be considered "marketing" AboutGolf's products, which is expressly prohibited by the 2010 Distributor Agreement.

### G.    Action Group Has Pled a Plausible Claim for Breach of Contract for Failure to Indemnify for Product Defects.

The contract provides in §15(A) in the 2010 Agreement, and §7 of the 2009 Agreement that:

> **Indemnification.**  AGL agrees to protect Distributor and hold Distributor harmless from any loss or claim arising out of warranty-related defects in Products that exist at the time of delivery, provided that Distributor gives AGL immediate notice of any such loss or claim and cooperates fully in the handling thereof.

The Complaint raises sufficient facts in ¶¶15-19 asserting that Action Group "has been inundated with customer complaints regarding faulty and defective products."  The cost of these problems to Action Group exceeded $700,000 (Complaint at ¶16).  At this early stage, Action Group is not required to list each and every problem, or else the complaint would go on for several hundred pages.  There are sufficient facts pled to state a plausible claim that AboutGolf should indemnify Action Group for its losses.  AboutGolf's response is that Action Group may have not followed all the procedural requirements necessary to secure the indemnification, a position that Action Group denies.  But AboutGolf's factual defense is just that—a factual one—and is not resolvable through a motion to dismiss at this early stage.

### H.    Action Group Has Pled Plausible Claims For Violations Of The Ohio Deceptive Trade Practices Act.

Action Group has pled plausible claims against AboutGolf for violations of the Ohio Deceptive Trade Practices Act (the "ODPTA") arising out of several instances of AboutGolf's engaging in the deceitful practice of selling "*vaporware*."  Vaporware is the high technology industries' marketing ploy of pre-announcing products that do not exist at the time of the announcement and may never come into existence in anything like their described form.  *See, Robert Prentice, Vaporware:  Imaginary High-Tech Products and Real Anti-Trust Liability in a*

*Post-Chicago World*, 57 Ohio St. Law Journal 1163, 1164(1996).  As one commentator has described the practice:

> Often, product pre-announcements are not made for the purpose of providing consumers and others with valuable information about the announcing company's good faith plans for completion of products currently in development.  Instead, the vaporware announcements are made recklessly or in bad faith by companies who know with substantial certainty that their promised deadlines will not be met, that their products will not carry the promised features, or that the promised products most likely will never reach the market.

*Id.* at 1175.  Indeed, Judge Sporkin – the trail court judge in the *United States v. Microsoft* case – condemned vaporware when he wrote, "Vaporware is a practice that is deceitful on its face and everybody in the business community knows it."  *See United States v. Microsoft*, 159 F.R.D. 318, 337 (D.D.C. 1995), rev'd. per curiam 56 F.3d 1448 (D.C. Cir. 1995).

The Complaint pleads six different instances where AboutGolf engaged in the deceitful practice selling vaporware:

1. AboutGolf made fraudulent and deceptive statements about the status of its product, "aG Control (a/k/a aG Center)." (See Complaint at ¶¶27-29);

2. AboutGolf made fraudulent and deceptive statements about the status of the product "PGA Tour Range Surround." (See Complaint at ¶¶30-32);

3. AboutGolf made fraudulent and deceptive statements about the status of the products "3/Trak Mobile" and "3/Trak Cube."  (See Complaint at ¶¶33-35);

4. AboutGolf made fraudulent and deceptive statements about the status of its products' capabilities for online gaming and connectivity.  (See Complaint at ¶¶36-38);

5. AboutGolf made fraudulent and deceptive statements about the development of additional sensors and cameras to gauge and record individual ball speed and flight directory,

20

as well as club speed and path.  (See Complaint at ¶¶39-41); and

6.   AboutGolf made fraudulent and deceptive statements about the development of Real Time 3D Graphics.  (See Complaint at ¶¶42-45).

Each of these instances of selling vaporware gives rise to plausible claims under the ODTPA.  In particular, the ODTPA provides:

*4165.02(A).*  A person engages in deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:

*************

(7)   Represents that goods or services has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that person does not have;

************

(9)   Represents that goods or services are a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

*************

(11)   Advertises goods or services with the intent not to sell them as advertised.

Through the ODPTA, the Ohio General Assembly intended to deter deceitful trade practices such as those employed in the sale of vaporware.[6]  Moreover, the Ohio General Assembly provided

---

[6]This case is not the first to argue that the practice of vaporware violates the ODTPA.  At least three cases originating in this Court are currently the subject of multi-district litigation in the Eastern District of Louisiana.  *Carr v. Apple, Inc., et al.*, C.A. No. 1:09-1996 (N.D. Ohio); *Pietrangelo v. Apple, Inc., et al.*, C.A. No. 1:09-1992 (N.D. Ohio); *Sullivan v. Apple, Inc., et al.*, C.A. No. 1:09-1993 (N.D. Ohio).  All three cases allege that Apple and AT&T made deceptive statements that misrepresented the technological capabilities of the Apple iPhone.  Based on

those harmed with a remedy through O.R.C. §4165.03, which provides that a wronged party may be awarded its actual damages and attorney fees.

Here, the facts pled in ¶¶27-45 of the Complaint show that AboutGolf's deceitful practice of vaporware violated several provisions of the ODPTA.  For instance, in selling vaporware with representations about what the products could do or would do, AboutGolf represented that its products had "characteristics…uses, benefits…that they do not have" in violation of O.R.C. §4165.02(A)(7). (Complaint at ¶75)  Also these same facts show that AboutGolf violated O.R.C. §4165.02(A)(9) by representing that its products were of a "particular standard, quality or grade…if they are of another."   (Complaint at ¶76)   *See, e.g., Lucky Disc. Lumber Co., Inc. v. Mach. Tools of Am., Inc*., 181 Ohio App. 3d 64 (2009) (finding a claim for the violation of (A)(9) when the qualities of forklift listed on eBay were inaccurate).  And, finally, vaporware – by its very definition – is the prohibited practice of selling products "without the intent to sell them as advertised" in violation of O.R.C. §4165.02(A)(11). (Complaint at ¶77).

AboutGolf responds that the plain language of the statute should be ignored.  Instead, AboutGolf seeks to have this Court insert language and pleading requirements that have no application to these specific claims.  Doing so effectively rewrites the statute's intent.  For this proposition, AboutGolf cites *HER, Inc. v. RE-Max First Choice, LLC*, 468 F. Supp. 2d 964, 979. *HER, Inc.* is readily distinguishable for a variety of reasons – not the least of which is the case that dealt with the  "likelihood of confusion" test necessitated by O.R.C. §4165.02(A)(1), (2), (3), and (10).  Those provisions apply the ODPTA to trademark infringement claims.  Those claims are not pled in this case, however.  Rather, Action Group has pled claims on entirely

---

representations of vaporware, each plaintiff has alleged that Apple and AT&T violated the Ohio Deceptive Trade Practices Act.

separate provisions of the ODPTA, O.R.C. §4165.02(A)(7),(8), and (11).  Thus, the pleading requirements in *HER, Inc.* are inapposite to Action Group's claims.

Next, Action Group alleges that claims were not pled with enough specificity.  That argument can be easily rejected. The claim for deceptive trade practices incorporated the previous facts through ¶73 of the Complaint.  Those prior paragraphs[7] detailed numerous instances of vaporware and should put AboutGolf on clear notice as to what of its deceptive practices are at issue.

Finally, AboutGolf argues that the claims should be limited because of the limitation of liability clause.  In addition to the several reasons discussed in Sections III A-D, there are several other reasons why any limitation of liability do not apply  First, the ODPTA claims do not arise "from... the termination or non-renewal" of the 2010 Agreement and, as a result, should not be barred by its terms of the limitation of liability clause.  Second, the ODPTA claims arise outside of the contract as separate causes of action and, thus, should not be subject to the limitation of liability clause in the contract. Third, to allow a party to limit its liability for willful deceptive conduct that violates Ohio antifraud statutes should be void as a matter of public policy.  Fourth, even if the limitation of liability clause is applicable, the limitation of liability does not exclude the recovery of either "actual damages" and attorneys' fees, both of which are expressly provided for in O.R.C §4165.03.

## I.    Action Group Has Pled Plausible Claims For Fraud.

Arising out of many of the same facts that give rise to the violations of the ODPTA, Action Group has also pled facts sufficient to state a common law claim for fraud.  In response to these claims, AboutGolf raises two issues:  (1) that a claim cannot be made for representations

---

[7]Specifically, see Complaint at ¶¶27-45.

about future actions; and (2) that a limitation of liability clause precludes a fraud.  Both can be rejected.

AboutGolf is simply wrong that Action Group's fraud claims must be dismissed because they are based on promises about future actions.  This argument ignores the well-known exception that promises about future actions can constitute fraud when the person making the statement has no present intent to perform.  *See Auto Chem Labs. v. Turtle Wax, Inc.,* No. 3:07-cv-156, 2008 WL 4372697, at *14 (S.D Ohio Sept. 23, 2008) (denying motion to dismiss fraud claims when defendant made representations about future actions without the present intention of performing them).  Ohio law is clear that a promise made with the present intention not to perform constitutes a misrepresentation of an existing fact even if the promised performance is to occur in the future.  *See Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007) (applying Ohio law); *Gouge v. Backs Global, Inc.*, 252 F. Supp. 2d 509 (N.D. Ohio 2003) (applying Ohio law) (Carr, J.).  An action for fraud is stated in those instances.  *See Carey v. Fed. Ex. Ground Package Systems, Inc.*, 321 F. Supp. 2d 902, 924-25 (S.D. Ohio 2004) (applying Ohio law).

Action Group has pled that AboutGolf made representations regarding its vaporware knowing they were false at the time and having no intention to fulfill them in the manner and nature of what was represented.  (Complaint at ¶83).  Moreover, the totality of the facts pled give rise to the reasonable inference that Action Group made these promises, again, at the time having no intention of keeping them.  That states a claim for fraud.  *See, e.g., Auto Chem Laboratories,* 2008 WL 4372697, at *14.

AboutGolf also claims that the fraud claim was excluded by the limitation of liability provisions.  This argument fails too.  First, limitations of liability for prospective fraud are unenforceable.  *See, e.g., Sanfillipo v. Rarden*, 24 Ohio App. 3d 164, 168 (1985).  Second, the

actions for fraud do not arise "from... the termination or non-renewal" of the 2010 Agreement and, as a result, should not be barred by its terms. Third, even if this Court applies some of the limitation of liability provisions, many of these representations were made well before the existence of the 2010 Agreement and are thus not excluded

### J.      Action Group Has Pled Plausible Claims for Promissory Estoppel.

Action Group's Complaint sufficiently alleges a claim for promissory estoppel under Ohio law.  Specifically, and in multiple instances, Action Group has pled: (1) a clear and unambiguous promise; (2) reliance upon the promise; (3) reasonable and foreseeable reliance on such a promise; and (4) injury as a result of such reliance.  See *Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F. Supp. 2d 899, 915 (S.D. Ohio 2009).

First, Action Group has pled that AboutGolf made clear and unambiguous promises regarding the completion, release, qualities, and capabilities of at least six distinct products or features.  (Complaint at. ¶¶27-45)  Action Group has also pled that AboutGolf promised a long-standing business relationship with Action Group.  (Complaint at ¶8.)  Second, Action Group has alleged that it relied on AboutGolf's promises by marketing and selling AboutGolf's *vaporware* and by entering into successive distributor contracts with AboutGolf.  (Complaint at  ¶¶5-7, 26, 28, 31, 34, 37, 40, 43, 90.)  Third, not only has Action Group pled that its reliance was reasonable and foreseeable, but it has also alleged that AboutGolf encouraged such reliance. (Complaint at  ¶¶26, 90)  Finally, Action Group has pled injury (Complaint at ¶¶29, 32, 35, 41, 44, 45, 91)

AboutGolf claims that Action Group cannot maintain an action for promissory estoppel on the basis that the claim does not contain "a single fact" and does not describe any of AboutGolf's promises. Contrary to this assertion, Count Six expressly incorporates all of the

factual allegations that precede it.  (Complaint at ¶88.)  Additionally, even though AboutGolf contends the allegations in Count Six are merely "naked assertions," AboutGolf's Motion then somehow proceeds to address the specific, unambiguous promises alleged in the Complaint. Therefore, any argument that Count Six fails for lack of detail is disingenuous.

Next, AboutGolf contends that its deceptive representations regarding the existence of certain products and future product developments do not provide a basis for promissory estoppel. (Defendant's Motion p. 16.)  To support this proposition, AboutGolf cites *Daup v. Tower Cellular, Inc.*, 136 Ohio App. 3d 555 (2000), a case that is both procedurally and substantively inapposite to the matter before the Court.[8]  Instead, *Executone of Columbus, Inc. v. Inter-Tel, Inc.*, 665 F. Supp. 2d 899) is a more analogous case.  The court in *Executone* held that a plaintiff sufficiently pled a claim for promissory estoppel by alleging that defendant promised to release new products, develop new versions of older products, and produce other product improvements. *Id.* at 915, 920.

AboutGolf further contends that the limitation of liability clause contained in the 2010 Agreement forecloses any opportunity for Action Group to establish "injury."  As discussed *supra*, the limitation of liability clause is not enforceable.  AboutGolf further argues that any promises are covered by the 2010 Agreement and are not actionable as a matter of law. However, when "alleged promises do not contradict the existing written contract…extrinsic evidence can be introduced to support a promissory estoppel claim."  *Executone*, 665 F. Supp. 2d at 920 (citing *Miller v. Lindsay Green, Inc.*, 2005-Ohio-6366 (Ohio Ct. App.)).  Here, any promises regarding product developments and deadlines not stated in the distributor agreement

---

[8]*Daup* was decided on summary judgment after plaintiff had ample opportunity to establish his claim through discovery and, moreover, addressed the doctrine of promissory estoppel as it applies to an employer's praise of an at-will employee.

fall outside the agreement's scope.  See *id.* at 920.  Because these alleged promises, made prior to, during, and after execution of each agreement, do not directly contradict the distributor agreement, the mere existence of the 2010 Agreement does not preclude a claim for promissory estoppel.

### K.    Action Group Has Pled a Plausible Claim for Unjust Enrichment.

Unjust enrichment provides an equitable remedy imposed to prevent injustice.  *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 502 (6th Cir. 2003).  In this context, under Ohio law, a party may maintain a claim for unjust enrichment despite the existence of an express contract where there is evidence of fraud, bad faith, or illegality.  *MMK Group, LLC v. SheSells Co., Inc.*, 591 F. Supp. 944, 964-65 (N.D. Ohio 2008) (citing *Wolfer Enters. v. Overbrook Dev. Corp.*, 132 Ohio App. 3d 353, 357 (1999)).  Furthermore, claims of unjust enrichment may be properly pled as alternatives to a breach of contract claim.  *Homecomings Fin., LLC v. Negrea*, No. 1:09-cv-2032, 2010 WL 85640, at *2 (N.D. Ohio, Jan. 6, 2010).  Here, allegations of fraud and bad faith permeate Action Group's complaint.  Thus, a dismissal of Count Seven would prove premature through a motion to dismiss.

Ohio law requires a party to allege: (1) a benefit conferred upon defendant by plaintiff; (2) defendant's knowledge of the benefit; and (3) acceptance or retention by defendant of the benefit under circumstances that make it inequitable for defendant to retain the benefit without payment of its value.  *Andersons*, 185 F. Supp. 2d at 837 (citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 183 (1984)).  Here, Action Group has alleged that it has spent a massive amount of resources and time to promote and sell AboutGolf's products in South Korea.  (Complaint ¶93)  AboutGolf contributed little, if anything, towards developing its brand in South Korea, yet has and continues to enjoy direct benefits in the form of profits from sales and

invaluable brand recognition and business relationships.  (*Id.*)  Action Group has managed to confer these benefits despite its reliance on Action Group's persistent fraudulent statements and vaporware.  (*Id.* ¶¶26-45)  Now, AboutGolf is seeking to usurp the fruit of Action Group's labor without compensation.  It would violate all notions of equity to allow AboutGolf to retain those wrongfully obtained benefits.

### L.    Action Group Has Pled a Plausible Claim for Tortious Interference with Business Relationship.

Under Ohio law, tortious interference with a prospective business relationship occurs "when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another, or not to perform a contract with another."  *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1043 (N.D. Ohio 2003) (citing *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14 (1995)).  An entity is subject to liability for the tort of intentional interference with a prospective business relationship if the interference consists of: (1) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (2) preventing the other from acquiring or continuing the prospective relation.  *Id.* (citing *Gray-Jones v. Jones*, 137 Ohio App. 3d 93, 100-01 (2000)).

The reasonable inferences from the Complaint show that AboutGolf's willful and fraudulent misrepresentations have caused customers to terminate their business relationships with Action Group.  (Complaint at ¶¶17, 24-45, 56)  Furthermore, the reasonable inferences drawn from these facts is that this conduct has prevented multiple prospective customers from entering into business relationships with Action Group.  (*Id.*)

Additionally, AboutGolf's communications with UMB, prevented Action Group from acquiring a prospective business relationship with UMB.  Action Group has alleged that

AboutGolf communicated directly with UMB regarding the sale and purchase of AboutGolf's products in South Korea.  (Complaint at ¶¶20-25)  Without this contact, the only method for UMB to acquire AboutGolf products in South Korea should have been through Action Group as the exclusive distributor in South Korea.  Thus, AboutGolf's tortious conduct prevented Action Group from acquiring a prospective business relation with UMB.

## IV.  CONCLUSION

For these reasons, Plaintiff Action Group International, LLC respectfully requests the Defendant AboutGolf, Limited motion to dismiss be **DENIED.**

Alternatively, should this Court grant parts of Defendant's motion, Plaintiff request that, pursuant to Fed. R. Civ. Pro. 15(a)(2), the Court grant Plaintiff leave to file an amended complaint to address any pleading deficiencies that may be raised by the Court.

Respectfully submitted,

*/s/Mark D. Wagoner, Jr.*
Thomas P. Dillon (0059899)
Mark D. Wagoner, Jr. (0068577)
SHUMAKER, LOOP & KENDRICK, LLP
North Courthouse Square
1000 Jackson Street
Toledo, Ohio 43604-1573
Telephone:  (419) 241-9000
Facsimile:   (419) 241-6894
Email:          tdillon@slk-law.com
                     mwagoner@slk-law.com

Attorneys for Plaintiff
Action Group International, LLC

## CERTIFICATE OF SERVICE

This is to certify that on November 22, 2010, a copy of the foregoing **Plaintiff Action Group International, LLC's Memorandum in Opposition to Defendant AboutGolf, Limited's Motion to Dismiss** was filed electronically. Notice of this filing will be sent to all parties by operation of the court's electronic filing system. Parties may access this filing through the court's system.

*/s/Mark D. Wagoner, Jr.*
Thomas P. Dillon (0059899)
Mark D. Wagoner, Jr. (0068577)
SHUMAKER, LOOP & KENDRICK, LLP

Attorneys for Plaintiff
Action Group International, LLC

30